Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter. The plaintiff was the employee of the defendant at the time in question.
2. The defendant regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the defendant and the plaintiff on 15 July 1996, the date of the injury alleged in I.C. File No. 664316, and on 9 May 1996, the date of the injury alleged in I.C. File No. 647003.
3. Scott Wetzel Services, Inc. administers the defendant's self-insured fully-funded employer plan.
4. The parties tendered at the hearing three stipulated exhibits which included Stipulated Exhibit No. 1 (Form 22 for the 15 July 1996 injury), Stipulated Exhibit No. 2 (bound packet of medical records), and Stipulated Exhibit No. 3 (Form 22 for the 9 May 1996 injury). The Form 22 indicates that the plaintiff's average weekly wage for the 9 May 1996 injury is $207.97, resulting in a weekly compensation rate of $138.72. The Form 22 indicates that the plaintiff's average weekly wage for the 15 July 1996 injury is $206.50, resulting in a weekly compensation rate of $137.74.
5. The parties stipulated to the medical records of Dr. Edward Hines, Dr. Mark Roy, Dr. Robert Sypher, Dr. J.A. Smith, Dr. Anthony Bray, Urgent Medical Care, Dr. Robert Gilbert and Stewart Physical Therapy.
6. The issues for hearing were whether the plaintiff sustained a compensable occupational disease arising out of and in the course of her employment on or about 9 May 1996, and if so, to what, if any, benefits she is entitled; and whether the plaintiff sustained a compensable injury by accident on or about 15 July 1996, and if so, to what, if any, benefits she is entitled.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows
 FINDINGS OF FACT
1. The plaintiff, age forty-eight at the time of the hearing before the Deputy Commissioner, is right-handed.
2. The plaintiff began working as a housekeeper for the defendant on 30 November 1994. Her job duties included making beds, cleaning shower stalls and bathroom fixtures, dusting, vacuuming and transporting supplies on a supply cart. The job required constant use of both hands. Although the plaintiff testified that she spent twenty to thirty percent of her time at work constantly squeezing a spray bottle with her left hand, Mr. C.W. Ruffy, a manager for the defendant, testified that squeezing a spray bottle accounted for only five percent of the time on the job. The Deputy Commissioner found the testimony of Mr. Ruffy more credible on this issue due to the parties' descriptions of the job duties. Therefore, the Full Commission declines to reverse the credibility determination by the Deputy Commissioner and finds that five percent of the plaintiff's time on the job was spent squeezing a spray bottle with her left hand.
3. The plaintiff has an extensive history of health problems, including hypothyroidism, alcoholism, tobacco abuse, depression, and arthritis. In April 1991, the plaintiff had symptoms of arthritic type shoulder pain bilaterally, and in April 1993, she had Heberden's nodes in her fingers and joints. She was diagnosed with DJD type arthritis in her hands in May 1993. In June 1993, the plaintiff complained of right upper quadrant pain radiating into her back. In October 1994, her arthritis flared up. She had a workers' compensation claim with the defendant for knee pain in May of 1995, and complaints of a lumbosacral sprain allegedly resulting from bending over to put bags of trash in a can at work in July of 1995.
4. On 5 October 1995, the plaintiff complained to Dr. Anthony Bray, her family doctor, that her fingers on both hands were going numb and that she also had some numbness in the big toe of her left foot. When she saw Dr. Bray again on 6 November 1995, among her complaints were numbness and tingling in her hands, especially the left hand, and occasional pain in her legs and numbness in her left big toe. She also reported a tender lump on her left wrist.
5. On 9 May 1996, the plaintiff went to Dr. James Barber at Doctor's Urgent Care Center for the knot on her left wrist and finger numbness. Dr. Barber noted that the plaintiff's fingers had the "crooked appearance of patient with rheumatoid arthritis." He referred the plaintiff to Dr. E.L. Hines at Burlington Orthopedic.
6. Dr. Hines first examined the plaintiff on 15 May 1996 and diagnosed a ganglion cyst of the left wrist and moderate to severe left carpal tunnel syndrome. He performed a carpal tunnel release on the plaintiff's left wrist on 12 June 1996, and removed the plaintiff's ganglion cyst at the same time. As a result of her surgery, the plaintiff missed two weeks of work from 12 June 1996 through 27 June 1996. Dr. Hines released the plaintiff to return to work full-duty as of 27 June 1996.
7. The plaintiff returned to work on 27 June 1996 and continued to work until 15 July 1996. On 15 July 1996, the plaintiff fell on both hands while cleaning a bathtub at work, sustaining an injury by accident arising out of and in the course of her employment with the defendant. The plaintiff went to Doctor's Urgent Care that day complaining of an injury to both wrists and her right breast as a result of the fall. Dr. Dallas A. Smith, Jr. diagnosed bilateral contusions and sprains to the plaintiff's wrists, left more than right. He allowed her to return to work but told her not to use her left arm.
8. Dr. Hines examined the plaintiff on 19 July 1996. Despite the plaintiff's fall of 15 July 1996, the plaintiff was continuing to progress normally with the healing process in her left wrist. He released her to return to work without restrictions. He told her to return as needed. This was the last time Dr. Hine's saw the plaintiff.
9. The plaintiff returned to Doctor's Urgent Care on 29 July 1996 indicating mild improvement in her wrists. Dr. Smith, however, recommended nerve conduction studies on the plaintiff's left wrist. She was released to return to work by Dr. Smith with no lifting greater than ten pounds and no repetitive use of her left arm.
10. The plaintiff continued to work for the defendant until 1 August 1996, when she voluntarily left work and did not return.
11. At the time the plaintiff quit working for the defendant, Dr. Hines, her orthopedic surgeon, had examined her and released her to return to work without restrictions. However, Dr. Smith at Doctor's Urgent Care Center released her to return to work lifting no greater than ten pounds and no repetitive use of the left arm. The Commission gives more weight to the opinion of Dr. Hines than to Dr. Smith because of Dr. Hines' expertise and because he had treated her wrist problem extensively. Therefore, the Commission finds that, at the time she quit working for the defendant, the plaintiff was capable of earning her regular wages and performing her regular duties.
12. The plaintiff returned to Dr. Smith at Doctor's Urgent Care on 2 August 1996 with continued complaints of diffuse pain in her left arm. He again released the plaintiff to return to work with restrictions. Subsequently, when Dr. Smith saw the plaintiff on 7 August 1996, she was complaining of severe pain in her left arm and an inability to work. At that time, Dr. Smith could find no objective evidence of median nerve compression and noted that the nerve conduction studies were essentially normal. He also noted that her pain was out of proportion to her physical impairment. He suggested a neurosurgical consult and referred her to Dr. Mark Roy.
13. Dr. Robert V. Sypher, Jr. of The Hand Center of Greensboro saw the plaintiff on 21 August 1996 for an independent medical evaluation. At that time, the plaintiff was complaining of pain, a burning sensation and swelling on the volar aspect of her wrist. He ordered a bone scan, which revealed "increased uptake in the DIP joint of the index and long fingers bilaterally corresponding to sites of known inflammatory osteoarthritis." When Dr. Sypher saw the plaintiff again on 30 August 1996, she was complaining of severe pain bilaterally, beginning at her fingertips all the way to the shoulder on the right and to the mid-brachium on the left. His clinical exam did not reveal a clear etiology of her complaints. Dr. Sypher suggested a pain management evaluation for plaintiff's pain and dysfunction syndrome.
14. Dr. Roy first saw the plaintiff on 23 September 1996. At that time, she reported that she had suffered significant left hand pain and pain radiating up the elbow of her left arm since her surgery. She also reported that since her July 1996 fall she had suffered bilateral arm pain and neck pain. This was the first instance in which the plaintiff's medical notes of record reflect complaints of neck pain following the July 1996 incident. Dr. Roy ordered an EMG, which was done without a nerve conduction study, and showed some axonal loss in the left median nerve without evidence of ongoing denervation. Cervical spine films demonstrated spondylitic disease, which is degenerative arthritic changes in her neck, between C5-6 and C6-7. An MRI revealed mild narrowing at C5-6 and C6-7, indicative of degenerative changes. Dr. Roy recommended physical therapy, which she received from 18 December 1996 through 13 March 1997.
15. The plaintiff reached maximum medical improvement on 11 April 1997 and Dr. Roy released her from his care.
16. Dr. Hines testified regarding the carpal tunnel syndrome and ganglion cyst in the plaintiff's left wrist. Initially, Dr. Hines testified that he had no opinion as to whether the plaintiff's job duties placed her at an increased risk of developing carpal tunnel syndrome or a ganglion cyst as opposed to those in other employment. Later, the plaintiff's counsel asked him whether "doing repetitive motion of squeezing a squeeze bottle for a sprayer exacerbate . . . [would] . . . put her at an increased risk of developing that carpal tunnel in the left hand." Dr. Hines was given no information about the extent to which the plaintiff did this activity. He responded that "there are certain people who are predisposed and who are likely to have carpal tunnel syndrome regardless of what kind of work they do . . . [s]o it's not a question that's easily answered." When asked about an increased risk yet again, Dr. Hines responded as follows:
 There are people who, for various reasons, are probably predisposed to having carpal tunnel syndrome, and in all likelihood repetitive, heavy use of that hand makes them even more likely to have it. But it's impossible to say whether they would have had it anyway, and so.
17. In light of Dr. Hines limited information about the plaintiff's job duties and the equivocal testimony he gave regarding any increased risk to the plaintiff, the plaintiff has failed to present sufficient evidence to establish by its greater weight that her job duties with the defendant placed her at an increased risk of contracting carpal tunnel syndrome or a ganglion cyst than the general public.
18. The exact etiology of a ganglion cyst has not been substantiated, and it is impossible to know whether the cyst is due to trauma, a pre-existing condition, or trauma superimposed on a pre-existing condition unless it is associated with a particular underlying disease entity. Dr. Hines did not evaluate the plaintiff for other diseases or problems, but he noted that she had some thyroid problem that could be contributory to carpal tunnel syndrome. He provided no further opinion regarding the causation of the plaintiff's ganglion cyst. However, Dr. Barber's notes reflect, and the Commission finds, that the ganglion cyst was not work-related.
19. As Dr. Hines testified, there are numerous causes of carpal tunnel syndrome, including ganglions, any inflammatory process, rheumatoid arthritis and hypothyroidism. The plaintiff suffered from several of these problems, as discussed above. However, the testimony of Dr. Hines established that the plaintiff's work duties, which included squeezing a squeeze bottle, could have been a contributing factor in the development of the carpal tunnel syndrome. Yet, considering the job duties of the plaintiff and the extent to which she used the squeeze bottle, the plaintiff's medical history, and the lack of further evidence on the significance of any contribution of her work to the development of the disease, the plaintiff failed to prove by the greater weight of the evidence that the plaintiff's job duties significantly contributed to, or were a significant causal factor in, the development of the plaintiff's carpal tunnel syndrome. Further, as stated by Dr. Roy, the fall of 15 July 1996 did not cause, aggravate or accelerate the development of the plaintiff's carpal tunnel syndrome.
20. Thus, the plaintiff did not prove that her carpal tunnel syndrome and ganglion cyst were due to causes and conditions which were characteristic of and peculiar to her employment with the defendant and which excluded all ordinary diseases of life to which the general public was equally exposed.
21. Although Dr. Roy testified that the plaintiff's median nerve damage could have come from the 15 July 1996 fall, his testimony in this regard is given no weight because Dr. Roy's opinion was based upon the mistaken impression that her wrist and arm pain did not begin until sometime after the surgery in June of 1996. He was apparently not aware that the plaintiff had carpal tunnel syndrome prior to the surgery and that she had a carpal tunnel release, only that she had the ganglion cyst removed. Therefore, the plaintiff failed to prove by the greater weight of the evidence that her median nerve damage was caused by the 15 July 1996 fall.
22. There was insufficient medical evidence to establish that the plaintiff's 15 July 1996 fall caused any injury to her wrists.
23. As testified by Dr. Roy, however, the 15 July 1996 fall exacerbated the plaintiff's pre-existing spondylitic changes in her neck.
24. Although the plaintiff was able to work her regular duties in August 1996, as of 23 September 1996, when Dr. Roy first saw the plaintiff, she was only able to work with restrictions. She was unable to do a great deal of heavy lifting and carrying. Further, due to her carpal tunnel syndrome, she could not do repetitive motions. She was able to do clerical work.
25. It is unclear from the record whether the defendant offered the plaintiff appropriate light duty work.
26. At the time of the hearing, before the Deputy Commissioner, the plaintiff was not working.
27. The plaintiff failed to establish that she made a reasonable effort to secure other employment.
28. The plaintiff failed to establish that it would have been futile to have attempted to look for work.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The plaintiff's left carpal tunnel syndrome and ganglion cyst were not occupational diseases causally related to conditions which were characteristic of and peculiar to her employment with the defendant and which excluded all ordinary diseases of life which the general public was equally exposed. N.C.G.S. § 97-53(13); Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E.2d 359 (1983); Hansel v. ShermanTextiles, 304 N.C. 44, 283 S.E.2d 101 (1981). She is therefore not entitled to any compensation under the North Carolina Workers' Compensation Act for her carpal tunnel syndrome and ganglion cyst. N.C.G.S. § 97-2 et seq.
2. On 15 July 1996, the plaintiff sustained an injury by accident arising out of and in the course of her employment with the defendant. N.C.G.S. § 97-2(6).
3. At the time the plaintiff quit her job with the defendant and up until September 1996, she was capable of earning her regular wages and performing her regular duties. Around September 1996, the plaintiff was capable of returning to work with restrictions. However, she did not return to work in any capacity, did not make a reasonable effort to obtain gainful employment and did not prove it would have been futile seek employment. She has failed to prove that she was unable to earn the same wages she earned before the injury. Russell v.Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454(1993). Therefore, she is not entitled to any disability benefits under the North Carolina Workers' Compensation Act. N.C.G.S. § 97-29, -30.
4. The plaintiff is entitled to have the defendant provide all medical compensation arising from the 15 July 1996 injury by accident. N.C.G.S. § 97-2(19), -25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendant shall pay all medical expenses incurred as a result of the 15 July 1996 injury by accident.
2. The defendant shall pay the costs.
3. The rating provided by Dr. Roy in his letter of 12 April 1997 did not set forth the part of the body to which the plaintiff sustained a permanent partial disability and did not state whether the rating was a result of her non-compensable carpal tunnel syndrome and median nerve damage, or whether it was a result of the compensable neck injury, a decision on the issue of permanent partial disability resulting from the injury by accident is deferred and reserved for the plaintiff to present sufficient evidence or settle the matter.
This the ___ day of November 1998.
 S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
S/ __________________ RENÉE C. RIGGSBEE COMMISSIONER
LKM/bjp